760 So.2d 120 (2000)
FLORIDA POWER CORPORATION, Petitioner,
v.
William WEBSTER, Respondent.
No. SC95122.
Supreme Court of Florida.
May 18, 2000.
Daniel A. Amat of Hart & Gray, Ocala, Florida; and Daniel J. Fleming of Melkus & Fleming, Tampa, Florida, for Petitioner.
J. Michael Shea of Shea and Associates, P.A., Tampa, Florida, for Respondent.
SHAW, J.
We have for review Webster v. CSX Transportation, 725 So.2d 462 (Fla. 5th DCA 1999), which expressly and directly conflicts with the decision in Massey v. Seaboard Air Line R.R., 132 So.2d 469 (Fla. 2nd DCA 1961). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. The petitioner asks us to revitalize what has come to be termed the "standing train doctrine" with respect to moving trains. Consistent with our treatment of the doctrine, we decline such an invitation. Instead we take the opportunity to formally *121 abolish the doctrine as anachronistic to our system of comparative fault. Accordingly, we approve the Fifth District's decision in Webster and disapprove Massey.
On October 11, 1995, at approximately 5 a.m. the respondent, William Webster, was driving southbound on State Road 495 in Citrus County. Webster alleges that when he was approximately one mile from a railroad crossing, its warning lights first flashed, then dimmed out. Believing the train had passed through the intersection he continued towards the crossing, which had no gates or other barriers, at approximately 40-45 m.p.h. When he was within thirty feet of the tracks, he discovered the train was still traversing the crossing. Webster alleges that because of the poor weather conditions (rain, fog, and darkness) he was unable to see the train until he was within thirty feet of the tracks. Unable to stop in time, he reached the tracks and was struck by the last car of a ninety-car train.
In his second amended complaint,[1] Webster sued respondent, Florida Power Corporation (FPC), the owner of the railroad crossing. He alleged that FPC was negligent in failing to maintain the flashing warning signals at the crossing and that it had a nondelegable duty to maintain the crossing area. FPC moved for summary judgment based on the standing train doctrine as articulated by this Court in Brown v. Loftin, 154 Fla. 621, 18 So.2d 540 (1944), and applied by the Second District in Massey.
In its motion for summary judgment, FPC incorporated affidavits indicating that the train's lights were burning, that its horn was sounding, and that its bells were ringing at the time of the accident. The trial court granted FPC's motion for summary judgment.
On appeal, the Fifth District reversed, holding that the standing train doctrine had been modified since its articulation in Brown, removing its application from the instant case. See Webster, 725 So.2d at 463-65. In so holding, the Fifth District refused to adopt the Second District's interpretation of the post-Brown modifications of the doctrine:

Massey held that the standing train doctrine had been modified with respect to standing (i.e., stationary) trains, but that the standing train doctrine had not been modified with respect to trains in motion. We believe that Massey failed to recognize the evolution in the law and Hutton's clear repudiation of a hard and fast rule. Further, the distinction made in Massey between a moving train and a stationary train is untenable because the Brown court held it to be a distinction without a difference.
Webster, 725 So.2d at 465. We agree with the Fifth District's reading of the doctrine's development.

The Standing Train Doctrine
"[O]ne who drives headlong into a train standing across a highway cannot be heard to complain of negligence because of the absence of any special warning, since the position of the train itself is the warning...." Hutton v. Atlantic Coast Line R.R., 92 So.2d 528, 530 (Fla.1957). This is the substance of what has come to be termed the "standing train doctrine."
As originally conceived, this Court consistently applied the doctrine to preclude plaintiffs from recovering damages from accidents with stationary trains or railcars occupying crossings regardless of any special conditions the plaintiff alleged. See, e.g., Kimball v. Atlantic Coast Line R. R., 132 Fla. 235, 181 So. 533 (1938) (affirming *122 sustaining of demurrer despite plaintiffs allegations of poor visibility and that an incline downwards in the road prevented the plaintiffs truck lights from illuminating the stationary freight cars); Clark v. Atlantic Coast Line R. R., 141 Fla. 155, 192 So. 621 (1939) (affirming sustaining of demurrer where plaintiff alleged that night was dark, foggy, and the road was wet and there were no street lights burning); Cline v. Powell, 141 Fla. 119, 192 So. 628 (1939) (affirming sustaining of demurrer where plaintiff claimed extreme darkness obscured the train).
This rigid and unforgiving application of the doctrine could be understood by reference to the doctrine itself. The doctrine as applied in the early cases absolved the railroad of any duty to warn because the train provided adequate notice of its presence. See, e.g., Kimball, 132 Fla. at 238-39, 181 So. at 534 ("The train remaining stationary on the crossing, ipso facto, could not be the proximate cause of the injury, but the proximate cause was the driving of the car into the freight train while it was standing on the crossing, or the plaintiff's own negligence.").
In Brown v. Loftin, this Court addressed the question of whether the doctrine encompassed accidents with moving trains. The plaintiff in Brown drove her automobile into the seventeenth car of a thirty-two car freight train while it traversed a street crossing. The trial court, relying on Kimball and its progeny, dismissed the plaintiff's complaint for failure to state a cause of action. The plaintiff argued that the rule of Kimball and subsequent cases was limited to accidents with standing trains. In Brown the Court found such a distinction unavailing, applying the doctrine and affirming the trial court's dismissal of the plaintiff's complaint.
Post-Brown Treatment of the Doctrine
Despite Brown's affirmation and extension of the doctrine, this Court gradually eroded the unforgiving approach of the earlier cases. Instead it began to consider the allegations of special circumstances previously deemed irrelevant. In Goff v. Atlantic Coast Line R. Co., 53 So.2d 777, 779 (Fla.1951), this Court distinguished Brown on the grounds that the accident involved a car and a train simultaneously approaching a crossing:
In the instant case, the facts are clearly distinguishable from those in Brown.... In [Brown], the train was fully occupying the crossing at the time such crossing came within the range of vision of the driver of the automobile; in the instant case, the train and the automobile were simultaneously approaching the crossing, which could not have been fully occupied by the train more than a few seconds prior to the impact and, it appears, not until some time after the crossing itself (as distinguished from the approach thereto) was within the range of vision of the driver. Under such circumstances, we do not think the "standing train doctrine" is applicable.
The plaintiff in Goff alleged that the railroad company negligently permitted a dense growth of trees and bushes to grow on either side of the track so that the train was partially obscured.
We further narrowed the doctrine in Horton v. Louisville & N.R. Co., 61 So.2d 406 (Fla.1952), in setting aside the trial court's grant of a motion to dismiss in favor of the railroad. In Horton the plaintiff, whose son was killed when he drove his motor bike underneath a standing box car, alleged that the light on the motor bike did not reflect high enough to show the box car standing across the highway. See also Atlanta & St. Andrews Bay Ry. v. Church, 212 F.2d 688, 691 (5th Cir.1954) (holding that circumstances affecting the plaintiffs opportunity to observe the crossing created a jury question as to whether the railroad's stopping and standing of the train constituted negligence).
In Atlantic Coast Line R. Co. v. Johnston, 74 So.2d 689 (Fla.1954), this Court affirmed judgments against a railroad arising *123 out of an accident with a standing train where the plaintiff alleged that it was dark and raining, and that the crossing was obstructed by trees and underbrush. The railroad maintained that the plaintiff's negligence was the sole proximate cause of the accident. Rather than preclude recovery based on the standing train doctrine, this Court opted to look at the circumstances surrounding the accident:
The answer to [the] question [of whether the plaintiff's negligence was the sole proximate cause of the accident] turns on the proof as to (1) whether or not the crossing was hazardous, (2) visibility at the time and place of the accident, (3) location of the locomotive and freight cars at the time of the accident and (4) condition of the approach to the crossing.
Id. at 689-90.
We again applied those factors in Hutton, where we formally acknowledged the shift from the strict application of the standing train doctrine to a fact-sensitive approach: "Although at one time this Court may have been committed to the `standing train doctrine' ... we have since engrafted upon that rule qualifying criteria capable of removing its harshly strict application when the facts warrant jury consideration." 92 So.2d at 530. The Hutton court, employing the Johnston factors, reversed the trial court's grant of the railroad's motion to set aside the verdict in favor of the plaintiffs where the plaintiffs claimed that the gondola car they collided with was dark and dingy, blending in with the color of the roadway surface, and that it was a dark night (there were no street lights illuminating the crossing): "[I]t is clear that the jury could have believed testimony and could have accepted evidence tending to prove that, under the facts of this case, the mere presence of the gondola car on the railroad crossing was not warning enough to these plaintiffs." Id. at 531.[2]
The petitioner argues that the Second District properly limited the aforementioned factual approach to accidents with stationary trains. The Massey court stated: "None of the cases cited by plaintiff [Hutton, Johnston, etc.], involve an accident with ... a running train and plaintiff striking same at a point indicating that the train had been running across a given point for three or four minutes. In such a case the moving train is a more obvious warning to vehicles on the highway than a train standing across the road." Massey, 132 So.2d at 471.
The petitioner further argues that this limitation on the doctrine's qualification was recognized by this Court when it discharged the petition for certiorari originally granted in Massey. See Massey v. Seaboard Air Line R.R., 142 So.2d 296 (Fla. 1962).
While the post-Brown cases limiting the application of the doctrine all involved accidents with stationary trains, or in the case of Goff, a car and train simultaneously approaching a crossing, reading the Hutton qualification to implicate a factual approach for stationary trains only is irreconcilable with the policies which engendered the factual approach adopted in Hutton and the cases preceding it. This conclusion is not altered by this Court's discharge of certiorari in Massey. This *124 Court acknowledged the distinction relied upon by the petitioner solely for purposes of illustrating the absence of the decisional conflict necessary to trigger the Court's jurisdiction, a fact emphasized by the Court in noting that it was not passing on the merits of the distinction attempted by the Second District in Massey: "Whether or not the decision of this Court would coincide upon the merits of that question vel non, we are unable to find the requisite decisional conflict on this point sufficient to activate our constitutional jurisdiction to review such decision by certiorari." Massey, 142 So.2d at 296. Moreover, as previously noted, this Court in Brown refused to distinguish between standing and moving trains for purposes of applying the doctrine. Our conclusion in Brown forecloses the distinction observed by Massey and urged by the petitioner.
The impetus for the factual approach wholly embraced in Hutton was the recognition of the impact of the statute then in force providing for a presumption of negligence against a railroad company and apportioning fault in negligence suits arising from railroad accidents. See §§ 768.05, 768.06, Fla. Stat. (1977) (repealed 1979). The statutes provided:
§ 768.05 Liability of railroad company. A railroad company shall be liable for any damage done to persons, stock or other property, by the running of the locomotives, or cars, or other machinery of such company, or for damage done by any person in the employ and service of such company, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company.
§ 768.06 Comparative Negligence. No person shall recover damages from a railroad company for injury to himself or his property, where the same is done by his consent, or is caused by his own negligence. If the plaintiff and the agents of the company are both at fault, the former may recover, but the amount of recovery shall be such a proportion of the entire damages sustained, as the defendant's negligence bears to the combined negligence of both the plaintiff and defendant.
§§ 768.05-.06, Fla. Stat. (1977).[3]
This Court in Goff noted that strict adherence to the standing train doctrine would be incompatible with the commands of the aforementioned statutes:
While the decision in the Brown v. Loftin case was entirely correct under the peculiar circumstances there present, we do not think the "standing train doctrine" should be indiscriminately applied in every case where a vehicle runs into the side of a train, regardless of how long or under what circumstances the train has been fully occupying the crossing, since this doctrine impinges at once on the provisions of Section 768.05, creating a presumption of negligence of the railroad company on proof of injury, and Section 768.06, authorizing the jury to apportion the damages in accordance with the comparative negligence of the parties when both are at fault.

53 So.2d at 778-79 (citations omitted, emphasis added). We echoed this sentiment in Horton, where we emphasized the effect of the comparative negligence regime particular to questions of railroad liability: "This is not an ordinary accident where contributory negligence would be a complete bar to recovery. In this case a railroad *125 company is involved and Section 768.05 and 768.06, F.S.A., govern liability." 61 So.2d at 407.
Accordingly, there is no compelling reason to limit Hutton's qualification of the doctrine to standing trains. As qualified, the doctrine is inapplicable where the respondent alleged that it was dark, foggy, and rainy at the time of the accident, and that the lights at the crossing malfunctioned, leading him to believe the train had traversed the crossing. See also Langston v. Chicago & N.W. Ry., 398 Ill. 248, 75 N.E.2d 363 (1947) (reversing a trial court's setting aside of a verdict in favor of the plaintiffs where the railroad's warning lights malfunctioned indicating that the crossing was clear when it was not).
Even if we were inclined to read the qualification of the doctrine narrowly as the petitioner suggests, an analysis of the history of the doctrine reveals that its purposes and policies no longer resonate. The doctrine's development was marked by a judicial effort to protect the developing railroad industry:
The standing train doctrine developed decades ago.... Policy considerations played a large part in the ultimate disposition of this type of lawsuit. Appellate judges, in their written opinions, frequently referred to the need for a well integrated transportation system. This need was often emphasized when railroads were the object of a lawsuit. The practical result of this was that many of the standards of care formulated to deal with accidents at railroad crossings favored railroads. This is not meant to suggest that such a development was unlawful. On the contrary, the courts, in recognizing the need, reflected the community's desire to favor a developing public-service industry.
Richard B. Scherrer, The Standing Train DoctrineAn Outmoded Standard of Care, 36 Mo. L.Rev. 586, 589 (1971)(footnotes omitted).[4]
Further, as the Tenth Circuit Court of Appeals noted in applying Oklahoma's counterpart to the standing train doctrine, "the occupied crossing rule," such a doctrine is a "legal dinosaur" in the landscape of modern tort law: "This appeal unlooses a legal dinosaur, which, once out, tramples twentieth century negligence law and then lumbers back to its dark cave only to await another victim. The jurisprudential fossils it leaves behind are truly daunting...." Hurst v. Union Pacific R.R., 958 F.2d 1002, 1003 (10th Cir.1992).
Moreover, although the statutes precipitating this Court's departure from the rigid application of the standing train doctrine have been repealed, our adoption of comparative negligence in Hoffman v. Jones, 280 So.2d 431 (Fla.1973), commands the same result.
The early cases applying the doctrine grounded the doctrine on a causation rationale, i.e., the plaintiff's failure to observe the train or drive cautiously under the circumstances was the sole proximate cause of the accident. Erected on this precipice, the doctrine can not cogently exist within our system of comparative negligence: "In effect, the [standing train] rule `buck[s] the twentieth-century trend... toward leaving questions of care to the jury to be decided under the broad, unelaborated standard of negligence. Both rules [the standing train rule and the stop, *126 look and listen rule] also buck the trend... toward making the victim's negligence a partial rather than a complete bar to damages." Hurst, 958 F.2d at 1006 (quoting Trevino v. Union Pacific R.R., 916 F.2d 1230, 1235 (7th Cir.1990)).[5]
Accordingly, we formally abolish the standing train doctrine, instead allowing the resolution of these cases to be guided by the broad standards of negligence. We therefore approve the Fifth District's decision in Webster, disapprove Massey, and remand for further proceedings consistent with this opinion.
It is so ordered.
HARDING, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Webster initially brought suit against the Department of Transportation (DOT), Citrus County, CSX Transportation, and Withlacoochee Electric, Inc. The claims against the DOT and Citrus County were voluntarily dismissed. Thereafter, Webster filed his initial amended complaint to include the remaining parties and FPC. After the trial court granted CSX's motion for summary judgment Webster filed a second amended complaint against FPC and Withlacoochee Electric, Inc.
[2] Accord Twenhafel v. Missouri Pacific R.R., 227 Ill.App.3d 107, 169 Ill.Dec. 105, 590 N.E.2d 1024, 1026 (1992) (finding a genuine issue of material fact as to whether special circumstances existed precluding application of the standing train doctrine where the plaintiff alleged poor visibility due to fog: "While there is no fixed rule as to what constitutes `special circumstances,' in applying an exception to the general rule that a train is adequate notice of its presence, perceptibility is an important element to consider."); but see Davis v. Burlington Northern, Inc., 663 F.2d 1028, 1030 (10th Cir.1981) (applying "unusual circumstances" exception to Oklahoma's version of the standing train doctrine, i.e., the "occupied crossing rule," stating, "[d]arkness and inclement weather such as mist, rain, and fog are not `unusual circumstances' within the meaning of the rule, but are hazards common to those who travel upon the highways").
[3] These provisions were originally enacted in 1891 and contained nearly identical language in providing for a presumption of negligence and comparative fault in negligence actions against railroads. See ch. 4071, §§ 1-2, Laws of Fla. (1891). The statutes were repealed in 1979 in response to this Court's determination that the statutes were unconstitutional. See Georgia S. & Fla. Ry. Co. v. Seven-Up Bottling Co., 175 So.2d 39 (Fla.1965) (holding the comparative negligence provision, section 768.06, unconstitutional on due process and equal protection grounds under both the federal and state constitutions); Florida East Coast Ry. v. Edwards, 197 So.2d 293 (Fla. 1967) (holding the same as to section 768.05).
[4] See also, Henry Woods & Beth Deere, Comparative Fault, §§ 1:4-1:5 (3d ed. 1996) ("[The contributory negligence doctrine] could be used to take cases away from the jury. The jury was becoming increasingly suspect in injury claims against railroads and corporate defendants.... Without the rule of contributory negligence as a complete bar, very little control could be exercised over the jury in railroad cases."); 4 Fowler V. Harper et al., The Law of Torts, § 22.1 (2nd ed. 1986) ("[The contributory negligence] doctrine was received in America hospitably enough; but in the important state of New York, for instance, it was not until mid century (1850) and the rise of industrial enterprise (particularly railroading) that the rule really assumed significance and began to come into its own.").
[5] See also Federal Deposit Insurance Corp. v. Deloitte & Touche, 834 F.Supp. 1129, 1141, n. 15 (E.D.Ark.1992) ("[The standing train doctrine is] part of a sad and senseless legal legacy that protects railroads from tort liability at the expense of innocent victims. They achieve that by preemptively defining what constitutes a motorist's fault or contributing fault, when the facts of the cases would not support such a determination absent the imposition of a special revisionist legal rule.").