# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| EDWARD E. (TED) COATES; MICHAEL CROWLEY; MARK BUBENIK and MARGARET BUBENIK d/b/a STEELE MANOR APARTMENTS; THOMAS H. OLDFIELD; and INDUSTRIAL CUSTOMERS OF NORTHWEST UTILITIES, an Oregon nonprofit corporation, | No. 51695-1-II |
| Respondents, | |
| v. | UNPUBLISHED OPINION |
| CITY OF TACOMA, | |
| Petitioner. | |

MELNICK, P.J. — In 1996, a City of Tacoma ordinance granted Tacoma Power the authority to build a telecommunications system. Under the ordinance, Tacoma Power would utilize a portion of this system to operate a TV and internet business, later named the Click! Network (Click!). The ordinance also established that the telecommunications system would be organized financially as a sub-unit of Tacoma Power and thus would share expenses and revenue with Tacoma Power's electric utility.[1]

Before implementing the system, the City of Tacoma filed a declaratory judgment action to determine the lawfulness of the ordinance. The taxpayers of the City of Tacoma and ratepayers

---

[1] We refer to Tacoma Power's "electric utility" as its traditional electric-distribution sub-units, such as generation, power management, and technology services.

of Tacoma Power opposed it. After two summary judgment rulings, the superior court entered a declaratory judgment that the ordinance was lawful. The taxpayers and ratepayers never appealed.

In 2017, Plaintiffs Ted Coates, Michael Crowley, Mark and Margaret Bubenik, Thomas Oldfield, and Industrial Customers of Northwest Utilities (collectively, the Ratepayers) sued the City alleging that, due to Tacoma Power's financial structure as it related to Click!, the funds from Tacoma Power's electric utility were unlawfully funding and subsidizing Click!. The superior court agreed and granted summary judgment in the Ratepayers' favor.

We reverse.

## FACTS[2]

### I. TACOMA POWER

The City of Tacoma owns Tacoma Public Utilities (TPU). TPU is governed by the Public Utility Board and consists of Tacoma Power, Tacoma Water, and Tacoma Rail. Click! is one of six sub-units that comprise Tacoma Power. The other five sub-units consist of more traditional electric-distribution functions like generation, power management, and technology services. Tacoma Power's expenses and revenues are accounted for in the City's Power Fund. Financially, Click! is intended to operate independently, and as a result, Click! maintains a sub-fund within the Power Fund. This fund collects Click!'s revenues and pays its expenses. In recent years, however, Click! has not been independently profitable, and the Power Fund has been used to offset Click!'s net losses.

---

[2] Where the facts are written in the present tense, they refer to facts that existed at the time of the summary judgment motions.

II.     HISTORY

    A.     Electric Industry in the 1990s

In the mid-1990s, the electric-distribution market underwent changes because of, among other factors, technological developments and changing consumer-demand market forces. Tacoma Power established a team to explore how it could respond to these changes. It decided "the best option was to construct a hybrid fiber coaxial telecommunications system." Clerk's Papers (CP) at 926.

The fiber part of the telecommunications system would improve Tacoma Power's generation, distribution, and transmission efficiencies, and the coaxial part of the system would support smart-metering functionality. The smart-metering functionality would allow Tacoma Power to monitor data in real time, which would make billing, connection and disconnection, and pay-as-you-go electricity consumption programs run more efficiently.

The primary reason for building the telecommunications system "was to provide a platform for more efficient use and control of Tacoma Power's generation, transmission, and distribution assets and to allow for the installation of smart meters." CP at 971 n.1. However, these features did not consume the entire load of the system. Tacoma Power realized that it could maximize revenue from the system by utilizing the remaining load and decided to do so by selling cable TV and internet service. Thus, the idea for Click! arose.

    B.     Ordinance

In 1996, the City passed an ordinance that created "a separate [telecommunications] system as part of the Electric System." CP at 122. It established infrastructure improvements and discussed the functions served by the new system. The first nine functions all related to traditional electric utility functions. The final three functions provided TV service, internet service, and the

transport of other signals including video on demand and high-speed data. The ordinance contemplated that the infrastructure improvements would serve all of the functions listed.

Regarding financial arrangements, the ordinance provided that the TV and internet business would be organized as a sub-unit of Tacoma Power and would share revenue with Tacoma Power. Additionally, to provide part of the funds necessary to finance the project, the City proposed issuing $1 million in bonds.

C.       Declaratory Judgment Action

In 1996, before implementing the telecommunications system, the City filed a declaratory judgment action in superior court seeking to establish the legality of the ordinance. The taxpayers of the City and ratepayers of Tacoma Power opposed it.

After two summary judgment motions, the court declared that the City had the authority to provide cable TV service, "lease telecommunications facilities and capacity to telecommunications providers," and issue bonds to help finance those operations. CP at 789.

As a result of the court's rulings, the City implemented the telecommunications system. The portion of the system used to sell TV and internet service was later called Click!.

D.       Technological Changes in the 2000s

At its inception, the telecommunications system allowed for efficient and remote operation of Tacoma Power's infrastructure. Subsequently, technological changes in the electric-distribution industry impacted how beneficial the system was to Tacoma Power's electric utility. As an example, although Tacoma Power initially intended the system to be used for smart metering, the industry switched to primarily using wireless meters. Tacoma Power itself stopped installing wired meters in 2009 and stopped replacing existing wired meters in 2015.

4

However, more recent data shows that the telecommunications system still serves a portion of its anticipated electric-distribution functions. Tacoma Power continues to use it to gather certain information and to control certain operations of electric generation, distribution, and transmission. It also still connects the remaining 14,240 wired smart meters.

The telecommunications system also continues to be utilized for Click!-related purposes. Click! utilizes the excess capacity on the system as a TV retailer and as an internet service wholesaler.

III.    CURRENT LAWSUIT

In 2017, the Ratepayers filed a lawsuit for declaratory relief against Tacoma Power alleging that it was unlawfully subsidizing Click!. The Ratepayers alleged that Tacoma Power's financial structure violated the local government accounting statute, RCW 43.09.210, and Tacoma City Charter art. IV, § 4.5.[3]

The Ratepayers moved for partial summary judgment. The City opposed the motion and also cross-moved for summary judgment.

After hearing argument, the trial court granted the Ratepayers' motion. The City sought discretionary review, which we granted.

---

[3] RCW 43.09.210(3) provides that "no department, public improvement, undertaking, institution, or public service industry shall benefit in any financial manner whatever by an appropriation or fund made for the support of another."

Tacoma City Charter art. IV, § 4.5 provides that "[t]he funds of any utility shall not be used to make loans to or purchase the bonds of any other utility, department, or agency of the City."

ANALYSIS

I.    LEGAL PRINCIPLES

We review an order for summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Rublee v. Carrier Corp.*, 192 Wn.2d 190, 199, 428 P.3d 1207 (2018). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

We review questions of statutory interpretation de novo. *Flight Options, LLC v. Dep't of Revenue*, 172 Wn.2d 487, 495, 259 P.3d 234 (2011). In interpreting statutes, "[t]he goal . . . is to ascertain and carry out the legislature's intent." *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). We give effect to the plain meaning of the statute as "derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

If a statute's meaning "is plain on its face, then we must give effect to that meaning as an expression of legislative intent." *Blomstrom v. Tripp*, 189 Wn.2d 379, 390, 402 P.3d 831 (2017). However, if "after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history." *Blomstrom*, 189 Wn.2d at 390. "A statute is ambiguous if 'susceptible to two or more reasonable interpretations,' but 'a statute is not ambiguous merely because different interpretations are conceivable.'" *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 452, 210 P.3d 297 (2009) (quoting *State v. Hahn*, 83 Wn. App. 825,

831, 924 P.2d 392 (1996)). "Whenever possible, statutes are to be construed so 'no clause, sentence or word shall be superfluous, void, or insignificant.'" *HomeStreet, Inc.*, 166 Wn.2d at 452 (internal quotation marks omitted) (quoting *Kasper v. City of Edmonds*, 69 Wn.2d 799, 804, 420 P.2d 346 (1966)).

## II.    LOCAL GOVERNMENT ACCOUNTING STATUTE[4]

The City argues that Click!'s financial structure does not violate the local government accounting statute, RCW 43.09.210.

The Ratepayers argue that Click! violates the statute because it is a separate "undertaking" from Tacoma Power and thus must be funded separately. We agree with the City.

The local government accounting statute "prohibits one government entity from receiving services from another government entity for free or at reduced cost absent a specific statutory exemption." *Okeson v. City of Seattle* (*Okeson* I), 150 Wn.2d 540, 557, 78 P.3d 1279 (2003). The statute provides:

> All service rendered by, or property transferred from, one department, public improvement, undertaking, institution, or public service industry to another, shall be paid for at its true and full value by the department, public improvement, undertaking, institution, or public service industry receiving the same, and no department, public improvement, undertaking, institution, or public service industry shall benefit in any financial manner whatever by an appropriation or fund made for the support of another.

RCW 43.09.210(3).

---

[4] The parties spend a considerable amount of time arguing whether the Ratepayers' current claims are barred by res judicata arising from the 1990s declaratory judgment action or whether collateral estoppel bars the relitigation of any previously decided issues. Because we decide the case on the merits, we need not resolve the issue of whether the declaratory judgment action has preclusive effect on the current issues.

The parties dispute whether Tacoma Power's electric utility and Click! are separate "undertakings." Neither case law[5] nor dictionary definitions[6] are particularly illuminating.

However, we rely on the principle of noscitur a sociis, which explains that "a single word in a statute should not be read in isolation." *State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005). Instead, "'the meaning of words may be indicated or controlled by those with which they are associated.'" *State v. Jackson*, 137 Wn.2d 712, 729, 976 P.2d 1229 (1999) (quoting *Ball v. Stokely Foods, Inc.*, 37 Wn.2d 79, 87-88, 221 P.2d 832 (1950)).

Accordingly, we read the term "undertaking" in the context of the other terms listed in the statute to determine whether Click! and Tacoma Power's electric utility are separate undertakings. We conclude they are not.

The Ratepayers encourage a broad reading of the term undertaking. However, their reading would make any different use of the existing infrastructure a separate undertaking under the accounting statute. Thus, if we adopted the Ratepayers' reading of the term undertaking, then that term would subsume every other term in the list. We interpret statutes to avoid such a result. *HomeStreet, Inc.*, 166 Wn.2d at 452. Instead, we read the term undertaking in the context of the other terms listed, but we also give it and the other terms in the statute their own meaning.

---

[5] The City relies on *Rustlewood Ass'n v. Mason County*, 96 Wn. App. 788, 981 P.2d 7 (1999), to support its argument. The Ratepayers rely on the *Okeson* line of cases. *Okeson v. City of Seattle* (*Okeson* III), 159 Wn.2d 436, 150 P.3d 556 (2007); *Okeson* I, 150 Wn.2d 540; *Okeson v. City of Seattle* (*Okeson* II), 130 Wn. App. 814, 125 P.3d 172 (2005). However, neither line of cases is controlling nor do we find the cases persuasive.

[6] An undertaking is "the act of one who undertakes or engages in a project or business." WEBSTER'S THIRD NEW INT'L DICTIONARY 2491 (2002). "Undertake" is defined as "to take in hand," to "enter upon," or to "set about." WEBSTER'S THIRD NEW INT'L DICTIONARY 2491.

Therefore, we agree with the dissent to the extent it argues that the term undertaking must have a different meaning than the other terms listed in the statute.

However, we disagree with the conclusion the dissent reaches. A separate project carried out by an entity can constitute a separate undertaking but not a separate department, public improvement, institution, or public service industry. But here, Click! is simply using the excess capacity of the electric utility's existing infrastructure. When reading the entire list in context, it is clear that providing an additional service using the utility's existing infrastructure is not a separate undertaking.

The whole telecommunications system is just one network of wires. Additionally, in deciding to implement the system, the City focused on the benefits that Tacoma Power would receive with regard to electric generation, transmission, and distribution. The system's potential cable TV and internet service capabilities were incidental and merely a way to maximize the new technology's potential. That structure has not changed. As such, Click! simply runs on the excess capacity of Tacoma Power's telecommunications system, a system that, as discussed above, was designed and implemented to maximize electric utility functionality. Therefore, we conclude that Click! and Tacoma Power's electric utility are one undertaking for purposes of RCW 43.09.210(3).

III.     TACOMA CITY CHARTER

The City argues that Click!'s financial structure does not violate Tacoma City Charter article IV, § 4.5 because Click! and Tacoma Power are not separate "utilities." We agree.

Article IV of the Tacoma City Charter governs public utilities. The Charter generally grants the City "all the powers granted to cities by state law to . . . operate . . . public utilities for supplying water, light, heat, power, transportation, and sewage and refuse collection, treatment, and disposal services." TACOMA CITY CHARTER art. IV, § 4.1. Besides certain exceptions, the

9

City cannot grant "any franchise, right or privilege to sell or supply water or electricity within the City of Tacoma." TACOMA CITY CHARTER art. IV, § 4.7. "Insofar as is possible and administratively feasible, each utility shall be operated as a separate entity." TACOMA CITY CHARTER art. IV, § 4.20. Additionally,

> The revenue of utilities owned and operated by the City shall never be used for any purposes other than the necessary operating expenses thereof, including . . . the making of additions and betterments thereto and extensions thereof, and the reduction of rates and charges for supplying utility services to consumers. The funds of any utility shall not be used to make loans to or purchase the bonds of any other utility, department, or agency of the City.

TACOMA CITY CHARTER art. IV, § 4.5. "Where common services are provided, a fair proportion of the cost of such services shall be assessed against each utility served." TACOMA CITY CHARTER art. IV, § 4.20.

The parties dispute whether Click! is separate "utility" from Tacoma Power's electric utility or whether it is simply a "betterment" of the utility.

The City designed and implemented the telecommunications system to facilitate Tacoma Power's ability to distribute electricity effectively and efficiently. That it could also be used in the manner in which Click! currently operates was only incidental and was a way to maximize the system's benefits. In other words, Click! was clearly intended as a betterment to Tacoma Power's telecommunications system in an effort to maximize a resource and "reduc[e] . . . rates and charges." TACOMA CITY CHARTER art. IV, § 4.5. That structure has not changed.

The fact that Click! is currently not independently profitable does not necessarily render it no longer a betterment. Rather, the City is attempting to maximize use of its resource, the telecommunications system, by utilizing the system's excess capacity to sell cable TV and internet

service.[7]  Because Click! is a betterment of Tacoma Power, we conclude that it does not violate the Tacoma City Charter.

We reverse.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, P.J.

I concur:

Glasgow, J.

---

[7] Whether Click!'s continued operation is sound business practice or good policy is not a decision for this court.

No. 51695-1-II

FEARING, J. (dissenting) — Based on the common understanding of the relevant statutory terms, based on the purposes behind the local government accounting statute, and based on Washington decisions that prohibit a city electrical utility from engaging in activities other than distribution of electricity, I conclude that, for purposes of RCW 43.09.210(3), the conveyance of Internet service and the delivery of cable television service constitutes separate undertakings and entails distinct industries from the generation and distribution of electrical power. Because ratepayers of the City of Tacoma's electrical utility must, under current practices, subsidize the distinct endeavors of Internet service access and cable television delivery, Tacoma must cease these unprofitable activities or at least stop charging expenses of such services to ratepayers. Therefore, I respectfully dissent. I would affirm the trial court's grant of summary judgment to Edward Coates against the City of Tacoma.

For someone not knowledgeable about buried cables and sunken transmission lines, the facts of this appeal sometimes tumble into the murky underground. Tacoma Power, an arm of the City of Tacoma, constructed a hybrid fiber-coaxial

telecommunications system to modernize and interconnect Tacoma Power's electrical generation, distribution, and transmission assets. A hybrid fiber-coaxial system consists of a broadband network that combines optical fiber and coaxial cable. The fiber portion of Tacoma Power's system improved electrical generation and distribution. The coaxial cable supported "smart-metering," a term for promoting efficient electrical connection, disconnection, and billing.

The hybrid fiber-coaxial lines held additional capacity or load to support other uses. Tacoma Power sought to increase revenue utilizing the hybrid fiber-coaxial system by selling cable television and Internet access. Tacoma Power created a punctuated subunit, "Click!," for the purpose of marketing cable and Internet.

Click! began with Ordinance No. 25930 adopted by the City of Tacoma City Council in 1996. The tedious, but important, ordinance reads, in part:

> ORDINANCE NO. 25930
> AN ORDINANCE of the City of Tacoma, Washington establishing a telecommunications system as part of the Light Division [former name of Tacoma Power], supplementing Ordinance No. 23514 and providing for the issuance and sale of the City's Electric System Revenue Bonds in the aggregate principal amount of not to exceed $1,000,000 to provide part of the funds necessary for the acquisition, construction and installation of additions and improvements to the telecommunications system.
> WHEREAS, the City of Tacoma (the "City") owns and operates an electric utility system (the "Electric System"); and
> WHEREAS, the Ordinance provides that the City may *create a separate system as part of the Electric System and pledge that the income of such separate system be paid into the Revenue Fund*; and
> WHEREAS, RCW 35A.11.020 authorizes the City to operate and supply utility and municipal services commonly or conveniently rendered by cities or towns; and
> WHEREAS, RCW 35.92.050 authorizes cities to construct and operate works and facilities for the purpose of furnishing any persons with

electricity and other means of power and to regulate and control the use thereof or lease any equipment or accessories necessary and convenient for the use thereof; and

WHEREAS, the Utility Board and the Council have determined that it is in the best interest of the City that it install a telecommunications system among all of its Electric System substations in order to improve communications for automatic substation control; and

WHEREAS, the City has determined that it is prudent and economical to provide additional capacity on such telecommunications system to provide the Electric System with sufficient capacity to perform or enhance such functions as automated meter reading and billing, appliance control, and load shaping; and

WHEREAS, the Light Division may wish to connect such telecommunications system to individual residences and businesses in its service area or to other providers of telecommunications services; and

WHEREAS, the City has determined that it should *create a telecommunications system as part of the Electric System* in order to construct these telecommunications improvements; and

. . . .

WHEREAS, after due consideration, it appears to the City Council and the Public Utility Board (the "Board") that it is in the best interest of the City to create and construct a telecommunications system and to issue Electric System Revenue Bonds to finance a portion of the costs of such construction and that the exact amount of Bonds and terms of the Bonds shall be determined by resolution of the Council; and

. . . .

ARTICLE II
FINDINGS; ESTABLISHMENT OF THE TELECOMMUNICATIONS PROJECT AS A SEPARATE SYSTEM; AND ADOPTION OF PLAN AND SYSTEM

Section 2.1. Establishment of Telecommunication System. The City hereby creates a *separate system of the City's Light Division* [former name of Tacoma Power] to be known as the telecommunications system (the "Telecommunications System"). The public interest, welfare, convenience and necessity require the creation of the Telecommunications System contemplated by the plan adopted by Section 2.2 hereof, for the purposes set forth in Exhibit A. The City hereby covenants that all revenues received from the Telecommunications System shall be deposited into the Revenue Fund.

Section 2.2. Adoption of Plan: Estimated Cost. The City hereby specifies and adopts the plan set forth in Exhibit A for the acquisition, construction and implementation of the Telecommunications System (the

14

"*Telecommunications Project*").  The City may modify details of the foregoing plan when deemed necessary or desirable in the judgment of the City.  The estimated cost of the Telecommunications Project, including funds necessary for the payment of all costs of issuing the Bonds, is expected to be approximately $40,000,000.

Section 2.3. Findings of Parity.  The Council hereby finds and determines as required by Section 5.2 of the Ordinance as follows:

A. The Bonds will be issued for financing capital improvements to the Electric System.

. . . .

EXHIBIT A
TELECOMMUNICATIONS PROJECT

The Telecommunications Project will include some or all of the following elements:

Infrastructure improvements

Construct a hybrid fiber coax ("HFC") telecommunications infrastructure consisting of fiber optic rings and branches connecting nodes throughout the Light Division service area.  This telecommunications system will be asymmetrically two-way capable.  It will interconnect all Light Division substations.  Connections may also be made with Light Division customers and with other providers of telecommunications infrastructure and services.  This telecommunications system will have 500 channels. . . .

Functions to be performed by infrastructure improvements

Through construction of the HFC telecommunications system, the Light Division's Telecommunications System will be capable of performing some or all of the following functions:

- conventional substation communications functions
- automated meter reading (electric and water)
- automated billing (electric and water)
- automated bill payment (electric and water)
- demand side management (DSM) functions, such as automated load (*e.g.* water heater) control
- provision of information to customers that is relevant to their energy and water purchasing decisions (*e.g.* information on time-of-use or "green" power rates)
- distribution automation
- remote turn on/turn off for electric and water customers
- city government communications functions
- CATV  [cable television] service

15

- transport of signals for service providers offering telecommunications services (*e.g.* Personal Communications Service (PCS), video on demand, high speed data, as well as conventional wired and wireless telecommunications services)
- Internet access service

CP at 122-24, 126, 145. Note that the ordinance established "a separate [telecommunications] system as part of the Electric System." CP at 122. The first nine functions listed in Exhibit A of the ordinance apply to the city's electrical utility. The last three functions apply to cable television and Internet service delivery.

In 1996, before laying the new hybrid fiber-coaxial telecommunications system, the City of Tacoma filed a declaratory judgment action in superior court seeking confirmation of the legality of Ordinance No. 25930. Tacoma sought declarations that:

b. The Bond ordinance was properly enacted.
c. The City has authority . . . to utilize the Telecommunications System to provide cable television service in the [Tacoma Power] service area.
d. The City has authority . . . to lease Telecommunications System facilities and capacity to telecommunications providers [sell internet service to internet service providers].
e. The City has authority . . . to issue the Bonds for the purposes set for in paragraphs (c) and (d) above and in the manner set forth in the Bond Ordinance.

CP at 714.

During the 1996 lawsuit, the City of Tacoma moved for summary judgment. Ratepayers opposed the motion and argued that the plan adopted by the ordinance was ambiguous and could potentially lose money. Ratepayers lamented that, as described in the ordinance, the system's financial structure would make Tacoma Power, and ultimately

Tacoma Power ratepayers, liable for any losses accrued. They argued that this structure violated section 4.2 of the Tacoma City Charter. Ratepayers also expressed concern that funding for the hybrid fiber-coaxial project would come, not only from Tacoma Power's revenue, but also from the City's general obligation fund and thus would subject the taxpayers of Tacoma to potential tax increases in violation of section 4.2.

The superior court, in the 1996 suit, initially granted the City's motion for summary judgment except on one question. In the initial award of judgment, the superior court ruled, in part, that the City had the legal authority to sell cable television service and access to broadband for Internet service providers. The court reserved a decision on the question of whether the City held authority to issue the revenue bonds.

In 1997, the City moved again for summary judgment on the question of authority to issue the bonds to finance the hybrid fiber-coaxial project. Ratepayers opposed the renewed motion and forwarded similar arguments to those raised previously. This time, ratepayers' experts opined that the "proposal represents a great financial risk and will cause a general indebtedness to the taxpayers and ratepayers of Tacoma that could only be paid by increasing the rates charged to the ratepayers . . . for utilities or borrowing from the [City's] general fund." CP at 823. In other words, ratepayers argued that, because of uncertainty in the hybrid fiber-coaxial project's profitability, genuine issues of fact precluded granting summary judgment.

Tacoma replied by arguing that it would retire the bonds solely from Tacoma Power's revenue, not the City's general obligation fund. Thus, city taxes would not

increase, and, as a result, section 4.2 of the Tacoma City Charter did not apply. Tacoma also argued that the question of whether the City would increase electricity rates to Tacoma Power ratepayers lacked relevance to the validity of the bonds, and, in turn, to the merits of the summary judgment motion. Tacoma wrote in a reply summary judgment brief:

> [The Ratepayers'] brief also argues extensively that revenues from the Telecommunications System may be inadequate to cover debt service on the Bonds. This factual argument is simply not material to the question of the City's authority to issue the Bonds, and therefore cannot raise a "genuine issue as to any *material* fact[.]" Moreover, the issue is outside of the scope of the Court's review.

CP at 834 (second alteration in original) (citation omitted). In other words, Tacoma contended that the superior court should not address the profitability, or lack thereof, of Click!.

At the conclusion of the 1996 suit, the superior court granted the City's summary judgment motion and ruled that Tacoma possessed authority to issue $1 million of revenue bonds to partly finance the hybrid fiber-coaxial telecommunications system. The court handwrote the following into its May 9, 1997 summary judgment order: "however, the Court is making no finding as to the financial feasibility of the Project or as to the legality of any future bond issues." CP at 848. Ratepayers did not appeal.

In 1997, the City of Tacoma City Council adopted Substitute Resolution No. 33668, which also addressed the new hybrid fiber-coaxial system. The resolution declares, in part:

> WHEREAS the City of Tacoma, Department of Public Utilities, Light Division [Tacoma Power] desires to: (1) develop a state-of-the art fiber optic system to support enhanced electric system control, reliability and efficiency; . . . (3) create greater revenue diversification through *new business lines (i.e. internet transport, cable TV*, etc.).

CP at 153 (emphasis added).

As a result of the superior court's ruling in the 1996 declaratory judgment suit, Tacoma constructed and implemented the hybrid fiber-coaxial telecommunications system. Through this system, Click! delivers cable television directly to customers. Click! sells access to its hybrid fiber-coaxial broadband transmission lines for purposes of Internet service providers' marketing Internet service to the providers' customers.

The City of Tacoma intended for Click! to operate independently of the other subdivisions of Tacoma Power. According to one expert, cable television and the Internet do not support the functions of an electrical utility. As stated during oral argument, distribution of cable television and Internet distribution does not employ the same cables or wires as those used for transmission of electricity. Wash. Ct. of Appeals oral argument, *Coates v. City of Tacoma*, No. 51695-1-II (Sept. 9, 2019), at 22 min., 35 sec. through 23 min., 20 sec. (on file with court).

Although Tacoma Power initially intended the hybrid fiber-coaxial telecommunications system to be used for smart metering, the electrical industry switched to using wireless meters. Tacoma Power stopped installing smart meters through the hybrid fiber-coaxial system in 2009 and stopped replacing existing wired meters in 2015. As of February 2018, 14,240 smart meters remained functioning.

Tacoma originally planned for 45,000 Click! customers. The number of customers peaked in 2010 at 25,000. By late 2014, the customers had steadily declined to 20,000. At that time, Click! provided cable service to only 17.5 percent of the homes it passed. The number of customers was projected to continue to decline.

The city of Tacoma's Power Fund accounts for the expenses and revenues of Tacoma Power. The Power Fund accounts separately for subunits of Tacoma Power, including the maintenance of a Click! sub-fund. This separate accounting has enabled the City to discern that Click! operates at a deficit. Click! loses around $5 million each year. Click! annually incurs millions of dollars of expenses related only to its operations, such as installing cable boxes, processing bills, and subscribing to programming. The Power Fund accounting also assigns to Click! shared expenses with the electrical utility such as the cost of the building in which the subunits office. Because of the losses, Tacoma Power electricity ratepayers subsidize the operations of Click!.

In 2014, the Tacoma City Council contracted with an outside firm to conduct a general management review. The review viewed Tacoma Power and Click! as functionally different entities. The review found that Click! was not independently profitable, and, as a result of the Tacoma Power and Click! revenue sharing financial structure, Tacoma Power ratepayers subsidized Click! The review deemed the subsidies unfair.

On July 16, 2015, Tacoma City Attorney Elizabeth Pauli and Chief Deputy City Attorney William Fosbre wrote a memorandum concluding that Tacoma Power

unlawfully operated Click! because of its lack of a nexus to the City's electrical utility

and because of the deficit spending. The memorandum opined:

> City electric utility revenues may be used to maintain the telecommunication system while it is being used to provide electric utility services to electric customers.
> City electric utility revenues may not be used to pay for the costs directly associated (such cable programming, set top boxes, marketing, etc.) with providing commercial telecommunications services (cable television and wholesale broadband Internet) to the public. These costs are not sufficiently related to providing electricity to utility customers, thus must be paid for from non-utility revenues. Non-utility revenues can include rates or charges to the telecommunication services customers or general government tax dollars. General government tax dollars can be used to offset the costs of providing municipal services (think theater district, Tacoma Dome, etc.).

CP at 62-63.

This court must decide whether Tacoma may require electricity ratepayers to underwrite Click!. Although Edward Coates also argues that Click! violates section 4.2 of the Tacoma City Charter, I rely exclusively on the local government accounting statute, RCW 43.09.210, to answer in the negative.

RCW 43.09.210 declares in part:

> (2) Separate accounts shall be kept for each department, public improvement, undertaking, institution, and public service industry under the jurisdiction of every taxing body.
> (3) All service rendered by, or property transferred from, one department, public improvement, undertaking, institution, or public service industry to another, shall be paid for at its true and full value by the department, public improvement, undertaking, institution, or public service industry receiving the same, and no department, public improvement, undertaking, institution, or public service industry shall benefit in any financial manner whatever by an appropriation or fund made for the support of another.

21

I focus on the latter half of RCW 43.09.210(3) that reads:

> *[N]o* department, public improvement, *undertaking*, institution, or *public service industry shall benefit in any financial manner whatever by an appropriation or fund made for the support of another.*

(Emphasis added.) This appeal compels us to decide what constitutes an "undertaking" and a "public service industry" for purposes of the statute. We must discern whether Internet service and cable television, on the one hand, constitute discrete undertakings or distinct industries from electricity distribution.

The City of Tacoma focuses only on one word, "undertaking," when arguing the subsidies afforded Click! by electrical ratepayers conforms with RCW 43.09.210(3). Tacoma contends that we should construe the term "undertaking" as being similar in nature to the other nouns found in the statute: department, public improvement, institution, and public service industry. Tacoma reasonably contends that, if the word "undertaking" does not echo the meaning of the other words, the term "undertaking" would subsume the entire statute. Stated differently, the legislature could have merely inserted the noun "undertaking" into the statute without including the words "department," "public improvement," "institution," or "public service industry" and convey the same meaning as the meaning of the statute with the additional nouns included.

Tacoma relies on the rule of statutory construction that teaches a court not to read in isolation a single word. *Jongeward v. BNSF Railway Co.*, 174 Wn.2d 586, 601, 278 P.3d 157 (2012). Instead, associated words placed in the statute control the meaning of

a word. *Cito v. Rios*, 3 Wn. App. 2d 748, 759, 418 P.3d 811, *review denied*, 191 Wn.2d 1017, 426 P.3d 747 (2018). But one can generally find a principle of interpretation that supports one's reading of a statute.

Another principle of statutory interpretation instructs the court to construe a statute to give effect to all the language used and avoid a construction that would render a portion of a statute meaningless or superfluous. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). Presumably, according to this principle, we must identify at least one example where the word "undertaking" covers some municipal endeavor not covered by the other nouns. The City of Tacoma supplies us no such example. Instead, if we limited the word "undertaking" to only cover the same nouns in RCW 43.09.210(3), we would render nugatory a key word of the statute. Tacoma jettisons the word "undertaking" from the local government accounting statute.

RCW 43.09.210 does not define any of the nouns catalogued in subsection (3). So I rely in part on a legal dictionary and a lay dictionary to discern the parameters of the word "undertaking" and the phrase "public service industry." A court may employ a standard English dictionary to determine the plain meaning of an undefined term. *State v. Fuentes*, 183 Wn.2d 149, 160, 352 P.3d 152 (2015). A court may also utilize a legal dictionary. *State v. McNally*, 361 Or. 314, 322, 392 P.3d 721 (2017); *Upshaw v. Superior Court*, 22 Cal. App. 5th 489, 504, 231 Cal. Rptr. 3d 505 (2018).

Black's Law Dictionary defines "undertaking," but only in the context of a pledge for financing. Merriam-Webster defines "undertaking" as:

23

        1a **:** the act of one who undertakes or engages in a project or business . . .

. . . .

        2 **:** something undertaken **:** enterprise.

MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/ dictionary/undertaking (last visited Nov. 26, 2019).

Assuming "undertaking" is synonymous with "enterprise," one might consider the hybrid fiber-coaxial transmission lines to constitute one enterprise, of which the smart-metering, cable television, and Internet are subparts. But that analysis falls short when considering that Click! is a separate business from the electrical distribution. Smart meters constitute only a portion of the facilities and technology used to operate Tacoma's electrical utility. Tacoma Power does not employ the hybrid fiber-coaxial telecommunications system to deliver electricity to its customers. Tacoma Power bills for electricity consumed by customers separately from cable television subscriptions and access to the cables for Internet service providers. The assessment of one enterprise further disassembles when contemplating that Tacoma Power is diminishing, if not ending, the smart-metering portion of the hybrid fiber-coaxial cable system.

Since the term "public service industry" includes three words, the lay dictionary does not define the phrase. Black's Law Dictionary omits any definition of "public service industry," but defines constituent parts of the term. The legal dictionary defines "public service" in relevant part as:

        1. A service provided or facilitated by the government for the general public's convenience and benefit.

BLACK'S LAW DICTIONARY 1488 (11th ed. 2019). Cable television and Internet is not provided by the government for the public's convenience and benefit. Electricity is. Black's Law Dictionary defines "industry" in relevant part as:

> 3. A particular form or branch of productive labor; an aggregate of enterprises employing similar production and marketing facilities to produce items having markedly similar characteristics.

BLACK'S LAW DICTIONARY 926 (11th ed. 2019). An electrical utility does not produce a product markedly similar to cable television and Internet.

In addition to reading dictionaries, I consider how legal settings utilize the term "public service industry." The law has considered public service industries to include railroads and bus systems. *Florida Power Corp. v. Webster*, 760 So. 2d 120, 125, 25 Fla. L. Weekly S384 (Fla. 2000); *City of Buffalo v. State Board of Equalization & Assessment*, 44 Misc. 2d 716, 718, 254 N.Y.S.2d 699 (N.Y. Sup. Ct. 1964); *California Motor Transport Co. v. Railroad Commission*, 30 Cal. 2d 184, 187-88, 180 P.2d 912 (1947); *Sale v. Railroad Commission*, 15 Cal. 2d 612, 617-18, 104 P.2d 38 (1940). The California court impliedly deemed a county's water system to represent a public service industry. *County of Inyo v. Public Utilities Commission*, 26 Cal. 3d 154, 158, 604 P.2d 566, 161 Cal. Rptr. 172 (1980). One court labeled an electric light plant as a public service industry. *Consolidated Gas, Electric Light & Power Co. of Baltimore v. City of Baltimore*, 130 Md. 20, 99 A. 968, 972 (1917). No court has labeled cable television or Internet service as a public service industry. Cable television is generally owned by private enterprise. Internet service providers are also usually private companies.

The word "industry" is commonly used without the appendage "public service." One law review article references the telecommunications industry as a distinct industry and electrical utilities as another distinct industry. William K. Jones, *Origins of the Certificate of Public Convenience and Necessity: Developments in the States*, *1870-1920*, 79 Colum. L. Rev. 426, 512, 516 (1979). One sometimes hears the term "cable television industry." Karl Bode, *The* Cable Industry *Makes $28 Billion Annually in Bull\*\*\*\* Fees*, TECHDIRT (Oct. 9, 2019 6:23 AM), https://www.techdirt.com/articles/20191008/08474843146/cable-industry-makes-28-billion-annually-bullshit-fees.shtml; Kristina Zucchi, *5 Reasons the* Cable TV Industry *Is Dying*, Investopedia (last updated June 25, 2019) (emphasis added), https://www.investopedia.com/articles/personal-finance/062315/5-reasons-cable-tv-industry-dying.asp. One never hears the appellation "cable television and electrical industry."

One article describes the Internet industry:

> The *Internet Industry* consists of companies that provide a wide variety of products and services primarily online through their Web sites. Operations include, but are not limited to, search engines, retailers, travel services, as well as dial-up and broadband access services.

*Industry Overview: Internet*, Value Line, http://www.valueline.com/Stocks/Industries/Industry_Overview__Internet.aspx#.XaISHmzn-Uk (last visited Nov. 26, 2019) (emphasis added). The article does not mention power generation or electrical distribution as being a product or service of the Internet.

The Washington Supreme Court, in *City of Issaquah v. Teleprompter Corp.*, 93 Wn.2d 567, 574-75, 611 P.2d 741 (1980), recognized cable television as a service

distinct from a city's electrical utility. The court favorably quoted a cable company's attorney as characterizing cable television as a luxury service and a television improvement. 93 Wn.2d at 574.

One Washington statute, RCW 80.04.010(23), defines a "public service company," rather than "public service industry." The statute's definition includes an "electrical company," and a "telecommunication company." But RCW 80.04.010 defines those two companies separately as if unrelated to one another. RCW 80.04.010(12) and (28).

I note that Tacoma Power separately accounts for the expenses and revenue of Click!. RCW 43.09.210(2) requires separate accounts for "each department, public improvement, understanding, institution, and public service industry." This separate accounting for Click! may illustrate Tacoma's understanding that Internet service and cable television involve distinct undertakings.

Ordinance No. 25930 recognized Click! as a distinct entity when it labelled Click! as "a separate system" within the Tacoma Power system. CP at 126, § 2.1. The follow-up resolution in 1997 described the new, separate system's Internet transport and cable TV services as "new business lines," i.e., different business lines from the electric utility's traditional business of supplying electricity to customers. CP at 153.

I now leave the minutiae of the wording found in RCW 43.09.210(3) and review the broad policy behind the local government accounting statute. Ultimately, in resolving the meaning of a statutory term, we adopt the interpretation that best advances the

legislative purpose. *Citizens Alliance for Property Rights Legal Fund v. San Juan County*, 184 Wn.2d 428, 437, 359 P.3d 753 (2015).

The Washington State Legislature enacted the local government accounting statute and the forerunner to RCW 43.09.210 in 1909 at the height of America's progressive era. LAWS OF 1909, ch. 76, § 3. We generally think of this era as influencing national policy, but the era engendered significant improvements to local and state government. The progressive movement sought to rid state and local government of political corruption and to render government efficient, goals that all points on the political spectrum can support. Progressive adherents lamented the waste and inefficiency at all levels of government.

Progressive era reforms included sound accounting standards essential for better government. James L. Chan & Qi Zhang, *Government Accounting Standards and Policies*, *in* The International Handbook of Public Financial Management 742 (Richard Allen et al. eds., 2013). During the first decade of the 1900s, the Grange promoted before state legislatures a uniform public accounting act, portions which became Washington's local government accounting act. Edward F. Green, *The Kansas State Grange Moving for Uniform Public Accounting*, 10 Public Policy: Journal for Correct Understanding of Public Questions & Development of Good Citizenship 22 (1904); *see also City of Cincinnati v. Board of Education*, 30 Ohio N.P. (n.s.) 595, 601 (C.P. Hamilton County 1933) (referencing Ohio General Code § 280: "No institution, department, improvement or public service industry shall receive financial benefit from

28

any appropriation made or fund created for the support of another.")  The uniform act promoted "the economy and efficiency in all branches of public business, so that the expenditures of public funds shall be placed on a systematic basis and be controlled by honest methods, in according with public needs."  Edward F. Green, *The Kansas State Grange Moving for Uniform Public Accounting*, 10 Public Policy: Journal for Correct Understanding of Public Questions & Development of Good Citizenship 22 (1904).

Click! flouts the spirit of RCW 43.09.210 by subsuming the costs of a losing undertaking in the cost of operating a vital service to the residents of Tacoma.  The accounting demanded by RCW 43.09.210 has unearthed government inefficiency and should lead to the ending of a wasteful project.  Characterizing Click! as the same undertaking or public service industry as the electrical utility allows a pet project of some politicians to survive despite its onus on electricity ratepayers.  The onus particularly inflicts economic harm on the poor since Tacoma Power enjoys a monopoly when transmitting electricity, an essential service for all residents of Tacoma, and the poor pay a higher percentage of their income on utilities.

Click! also offends Washington case law that holds a city's electrical utility may not engage in endeavors other than the sale of electricity.  Since 1890, cities have held statutory power to operate an electrical utility.  *City of Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d 679, 695-96, 743 P.2d 793 (1987).  The legislature believed that a municipality could provide lower cost and more efficient electrical service.  *Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d at 696.  Municipal ownership of electrical

distribution seeks to give the citizen the best possible service at the lowest possible price. *Uhler v. City of Olympia*, 87 Wash. 1, 14, 151 P. 117, 152 P. 998 (1915). Accordingly, a municipal utility has a duty to provide low cost, efficient service. *Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d at 696. Additionally, a municipal electric utility may not impose on ratepayers the costs of activities that do not have a "sufficiently close nexus" to the utility's primary purpose of "supplying electricity to the municipal corporation and its inhabitants." *Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d at 695-96.

A series of Washington decisions precludes a city's electrical utility from charging ratepayers for extraneous endeavors. In *Okeson v. City of Seattle* (*Okeson* I), 150 Wn.2d 540, 78 P.3d 1279 (2003), the Washington Supreme Court ruled that the city's imposition on electric utility customers of a rate or other charge for the maintenance and operation of streetlights was an unauthorized tax. The city's electric utility serves a proprietary function of the government. Therefore, the electric utility operates for the benefit of its customers, not the general public. Providing streetlights was a governmental function unrelated to the electric utility.

The Washington State Legislature legislatively overruled *Okeson* I. LAWS OF 2002, ch. 102, § 1. But its main holding of prohibiting unrelated services remains true.

In *Okeson v. City of Seattle* (*Okeson* II), 130 Wn. App. 814, 125 P.3d 172 (2005), the high court held that electric utility revenues could not be used to pay for public art not directly related to the utility. In *Okeson v. City of Seattle* (*Okeson* III), 159 Wn.2d 436, 150 P.3d 556 (2007), the high court held that electric utility revenues could not be used

30

to pay other parties for mitigating their greenhouse gas emissions, as part of the city's program to combat global warming. If a city electrical utility cannot charge its ratepayers for the beneficial effects of reducing greenhouse gases, this court should not allow Tacoma Power to charge its ratepayers for underwriting a flopping cable television and Internet system.

*Smith v. Spokane County*, 89 Wn. App. 340, 948 P.2d 1301 (1997) bears some resemblance. Sandra Smith filed an action against Spokane County and the City of Spokane challenging the fees imposed on water and sewer customers within the Spokane–Rathdrum Aquifer Protection Area. Division Three of this court relied on the local government accounting statute and considered the aquifer protection activities a separate undertaking from the provision of water and sewer. Therefore, under RCW 43.09.210 the city and county could not charge utility customers for the activities.

The City of Tacoma relies principally on *Rustlewood Association v. Mason County*, 96 Wn. App. 788, 981 P.2d 7 (1999). *Rustlewood Association* helps Tacoma none. This court, in *Rustlewood Association*, addressed whether costs needed to be allocated among different residential subdivisions served by the same utility. In contrast, Tacoma's appeal concerns the allocation of expenses between an electric utility and distinct business lines.

The City of Tacoma may rely on the fact that Click! uses the same hybrid fiber-coaxial system as the electrical distribution system such that cable television, Internet,

and electricity distribution entail the same undertaking and the same public service industry. Nevertheless, RCW 43.09.210 does not suggest that, because two endeavors entail overlapping facilities, the two activities involve the same undertaking or industry. The electrical lines of Tacoma Power, the most essential byway of the utility, remain separate from the hybrid fiber-coaxial telecommunications system.

The City of Tacoma argues that Click!'s provision of Internet and cable television must be the same undertaking or public service industry since they operate within the same department, Tacoma Power. This argument would allow a municipality to avoid the strictures of RCW 43.09.210 by folding unrelated endeavours into the same department. Tacoma could operate a library inside the sewer department and charge sewer customers with the cost of the library. Tacoma's argument promotes form over substance and breaches the spirit of the local government accounting statute.

The City of Tacoma highlights that it still owns and possesses the hybrid fiber-coaxial telecommunications system. Tacoma further underscores that it only uses the system's excess capacity. Tacoma may thereby argue that, since the system exists and its excess capacity could raise revenue, the City should be permitted to operate Click!. This emphasis ignores the fact that Click!'s costs exceed the revenue accumulated by the sale of the excess capacity. The law allows Tacoma to still own and possess the system with its surplus capacity, but not to market the excess capacity at a loss. Tacoma may even operate a cable television system and allow Internet service providers access to the hybrid fiber-coaxial cables, but not to the detriment of electrical utility customers.

During oral argument, the City of Tacoma contended that Click! is not operated at a financial loss. Wash. Ct. of Appeals oral argument, *Coates v. City of Tacoma*, No. 51695-1-II (Sept. 9, 2019), at 30 min, 50 sec. through 32 min., 5 sec. (on file with court). Nevertheless, Tacoma presented no facts, in opposition to Edward Coates's summary judgment motion, to create an issue of fact as to the profitability of Click!. Coates presented overwhelming, uncontroverted evidence of a financial loss. When questioned further during oral argument, Tacoma agreed it presented no affidavit testimony of profitability. Wash. Ct. of Appeals oral argument, *Coates v. City of Tacoma*, No. 51695-1-II (Sept. 9, 2019), at 31 min., 45 sec. through 32 min., 5 sec. (on file with court).

The City of Tacoma also asks that this court reverse the trial court ruling on the basis of res judicata and collateral estoppel. Tacoma contends the 1996 litigation bars Edward Coates from relitigating whether Tacoma can operate Click! at a financial loss. Nevertheless, the earlier court never addressed the profitability of Click! or the impact of financial losses on Click!'s authority to conduct business. Tacoma unfairly raises issue and claim preclusion because, when ratepayers mentioned the possibility of financial losses during the 1996 lawsuit, the City contended that the profitability of Click! had no relevance to its declaratory judgment action.

Collateral estoppel or issue preclusion applies only when the two cases involve identical issues. *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987). The 1996 litigation did not entail the same issue.

33

The City of Tacoma filed the 1996 lawsuit in the form of a declaratory judgment action. RCW 7.24.010 grants the superior court jurisdiction to declare the rights of parties. The statute further prescribes that:

> [S]uch declarations shall have the force and effect of a final judgment or decree.

Based on RCW 7.24.010, Tacoma argues that the same res judicata effects emanating from other lawsuit judgments extend to a declaratory judgment order. In turn, Tacoma emphasizes the rule that res judicata, or claim preclusion, prohibits the relitigation of claims and issues that could have been litigated in a prior action. *Eugster v. Washington State Bar Association*, 198 Wn. App. 758, 786, 397 P.3d 131 (2017). Tacoma claims that ratepayers could have raised the issue of the lack of profitability during the 1996 litigation.

I question whether the ratepayers could have raised the argument of the lack of profitability of Click! during the earlier lawsuit when Tacoma contended that Click!'s profitability lacked any relevance to the claims asserted. The superior court in its 1997 order approving the bond issuance likely agreed since it handwrote a notation that it did not decide Click!'s profitability. Regardless, res judicata does not apply against Edward Coates because of the limited nature res judicata plays in the context of a declaratory judgment action.

No Washington decision has addressed the applicability of res judicata to an earlier declaratory judgment. Nevertheless, the universal rule declares that res judicata

34

extends only to issues actually decided. Therefore, res judicata and collateral estoppel conflate in the context of a declaratory judgment action.

Restatement (Second) of Judgments section 33 (1982) declares:

> A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.

22A Am. Jur. 2d Declaratory Judgments section 244 (2019) likewise reads:

> A declaratory judgment is only a bar to matters which were actually litigated, not to those that might have been litigated. Nor is it an absolute bar to subsequent proceedings where the parties are seeking other remedies even though based on claims that could have been asserted in the original action.

Numerous state courts and federal courts have addressed the extent of res judicata in the context of declaratory judgment actions and have ruled that the doctrine extends only to issues actually litigated. States so holding have a similar statute to RCW 7.24.010 that affords declaratory orders the same status as other judgments. *Jackinsky v. Jackinsky*, 894 P.2d 650, 654-57 (Alaska 1995); *Aerojet-General Corp. v. American Excess Insurance Co.*, 97 Cal. App. 4th 387, 401-03, 117 Cal. Rptr. 2d 427, (2002); *Eason v. Board of County Commissioners*, 961 P.2d 537, 539-40 (Colo. App. 1997); *North Shore Realty Corp. v. Gallaher*, 99 So.2d 255, 256-57 (Fla. App. 1957); *Stilwyn, Inc. v. Rokan Corp.*, 158 Idaho 833, 842-45, 353 P.3d 1067 (2015); *Gansen v. Gansen*, 874 N.W.2d 617, 620-23 (Iowa 2016); *Bankers & Shippers Insurance Co. v. Electro Enterprises, Inc.*, 287 Md. 641, 652-55, 415 A.2d 278 (1980); *Andrew Robinson*

51695-1-II

*International, Inc. v. Hartford Fire Insurance Co.*, 547 F.3d 48, 52-59 (1st Cir. 2008); *Ganaway v. Shelter Mutual Insurance Co.*, 795 S.W.2d 554, 562 (Mo. App. 1990); *Boca Park Marketplace Syndications Group, LLC v. Higco, Inc.*, 133 Nev. 923, 925-27, 407 P.3d 761 (2017); *Radkay v. Confalone*, 133 N.H. 294, 297-98, 575 A.2d 355 (1990); *Tunis v. Country Club Estates Homeowners Association, Inc.*, 2014-NMCA-025, ¶¶ 1-22, 318 P.3d 713 (N.M. App. 2013); *Harborside Refrigerated Services, Inc. v. Vogel*, 959 F.2d 368, 372-73 (2d Cir. 1992); *In re Estate of Cox*, 97 N.C. App. 312, 314-15, 388 S.E.2d 199 (1990); *State ex rel. Shemo v. City of Mayfield Heights*, 95 Ohio St. 3d 59, 68-69, 765 N.E.2d 345 (2002); *Oklahoma Alcoholic Beverage Control Board v. Central Liquor Co.*, 421 P.2d 244, 247, 1966 OK 243 (Okla. 1966); *Catawba Indian Nation v. State*, 407 S.C. 526, 539-41, 756 S.E.2d 900 (2014); *Carver v. Heikkila*, 465 N.W.2d 183, 186 (S.D. 1991); *Martin v. Martin, Martin & Richards, Inc.*, 989 S.W.2d 357, 359, 42 Tex. Sup. Ct. J. 21 (1998); *Cupola Golf Course, Inc. v. Dooley*, 2006 VT 25, ⊞10, 179 Vt. 427, 898 A.2d 134 (2006); *Stericycle, Inc. v. City of Delavan*, 120 F.3d 657, 659 (7th Cir. 1997).

_____
Fearing, J.